T.C. Memo. 2020-145

UNITED STATES TAX COURT

MICHAEL C. GIAMBRONE, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

WILLIAM W. GIAMBRONE AND MICHELE L. GIAMBRONE, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 11109-18, 11153-18.        Filed October 19, 2020.

Kathleen M. Lach and Robert E. McKenzie, for petitioners.

Michael T. Shelton, Richard L. Wooldridge, and Elizabeth A. Carlson, for

respondent.

MEMORANDUM OPINION

URDA, Judge: Petitioners, Michael Giambrone and William and Michele

Giambrone (together, Giambrones), challenge the disallowance of a theft loss

**[\*2]** deduction claimed on their respective 2012 Federal income tax returns.[1]  The

Giambrones argue, among other things, that they qualified for the deductions

because of the safe harbor set out in Rev. Proc. 2009-20, 2009-14 I.R.B. 749.[2]

Respondent has moved for partial summary judgment on this point, contending

that the Giambrones did not satisfy the safe harbor's prerequisites because the

theft was discovered before, not during, the year at issue.  We will grant

respondent's motion.

Background

For purposes of deciding this motion, we assume correct the facts asserted

by the Giambrones that are supported by their filings, as well as the facts asserted

by respondent that are undisputed.  See, e.g., Barnhill v. Commissioner, 155 T.C.

__, __ (slip op. at 4) (July 21, 2020); P & X Markets, Inc. v. Commissioner, 106

T.C. 441, 442 n.2 (1996), aff'd without published opinion, 139 F.3d 907 (9th Cir.

1998).  The Giambrones lived in Illinois when they timely filed their petitions.

---

[1]Unless otherwise indicated, all section references are to the provisions of the Internal Revenue Code of 1986 (Code), as amended, in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  All monetary amounts are rounded to the nearest dollar.

[2]"A revenue procedure is an official statement of a procedure that affects the rights or duties of taxpayers under the Code and related statutes, treaties and regulations that should be a matter of public knowledge."  Eaton Corp. v. Commissioner, 140 T.C. 410, 416 n.3 (2013).

[*3] A.     The Business of the Brothers Giambrone

Michael Giambrone and William Giambrone are brothers who worked together in the mortgage business.  On March 1, 1999, the brothers founded Platinum Community Bank (Platinum), a federally chartered stock institution with a home office in Rolling Meadows, Illinois.  Platinum's operations included mortgage, home equity, and consumer and commercial real estate lending.  The brothers owned Platinum through a holding company, Platinum Bancshares, Inc. (Holding), in which they held a 52.2% interest as of January 3, 2007.

From its start Platinum was unprofitable.  To raise additional capital Holding entered into a common stock purchase agreement with a Florida corporation, Taylor Bean & Whitaker Mortgage Corp. (TBW), on December 18, 2007.  As of January 30, 2009, TBW had acquired an 82.6% interest in Holding, with the brothers retaining a 9.1% interest.

Following TBW's acquisition of a controlling interest in Holding, Lee Bentley Farkas, TBW's majority shareholder, was appointed chairman of Holding and Platinum.  Under Mr. Farkas' direction, TBW transferred large amounts of its Federal Home Loan Mortgage Corporation (FHLMC) escrow deposits[3] into

---

[3]An escrow deposit is a trust account held in a borrower's name to pay obligations such as property taxes and insurance premiums.

[*4] Platinum and using the same deposits ordered Platinum to purchase TBW mortgage loans. In total, Platinum purchased $481 million in TBW mortgage loans.

Platinum ultimately was unable to sell the loans back to TBW or to third parties when required to do so by FHLMC. On September 4, 2009, Platinum was closed by the Office of Thrift Supervision and placed into receivership by the Federal Deposit Insurance Corporation.

B.     Criminal Proceeding Against Mr. Farkas

On June 15, 2010, a Federal grand jury returned an indictment against Mr. Farkas charging him with conspiracy and bank, wire, and securities fraud. According to the indictment Mr. Farkas had devised a scheme to misappropriate over $1 billion in funds from various financial institutions, including TBW, the FHLMC, the Government National Mortgage Association, and the Troubled Asset Relief Program. A jury convicted Mr. Farkas on April 19, 2011, and he later was sentenced to 30 years in prison.

C.     The Giambrones' Theft Loss Deductions and the IRS Examination

The Giambrones claimed theft loss deductions of 95% of the value of their investments in Platinum on their 2012 Federal income tax returns. The Giambrones premised their claimed deductions on Rev. Proc. 2009-20, sec. 1,

**[*5]** 2009-14 I.R.B. at 749, which provides "an optional safe harbor treatment for taxpayers that experienced losses in certain investment arrangements discovered to be criminally fraudulent."

On March 20, 2018, the Internal Revenue Service (IRS) issued separate notices of deficiency to Michael Giambrone and William and Michele Giambrone, disallowing the claimed theft loss deductions on the ground that the Giambrones had failed to satisfy the revenue procedure's requirements. The notice issued to Michael Giambrone determined income tax deficiencies of $842,554 for 2012, $80,763 for 2013, $204,716 for 2014, and $385,210 for 2015, and accuracy-related penalties under section 6662 of $168,511 for 2012, $16,153 for 2013, $40,943 for 2014, and $77,042 for 2015. The notice issued to William and Michele Giambrone determined income tax deficiencies of $840,499 for 2012, $272,304 for 2014, and $340,205 for 2015, and accuracy-related penalties under section 6662 of $168,100 for 2012, $54,461 for 2014, and $68,041 for 2015.

## Discussion

### I.  Summary Judgment

The purpose of summary judgment is to expedite litigation and avoid costly, time-consuming, and unnecessary trials. Fla. Peach Corp. v. Commissioner, 90 T.C. 678, 681 (1988). Under Rule 121(b) the Court may grant partial summary

**[\*6]** judgment regarding an issue when there is no genuine dispute as to any material fact and a decision may be rendered as a matter of law.  See <u>Elec. Arts, Inc. v. Commissioner</u>, 118 T.C. 226, 238 (2002).  While we construe factual materials and inferences drawn from them in the light most favorable to the nonmoving party, that party may not rest upon the mere allegations or denials of his pleadings but instead must set forth specific facts showing that there is a genuine dispute for trial.  Rule 121(d); <u>see</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986).

II.     <u>Theft Loss Deduction</u>

    A.     <u>Deduction Under Section 165</u>

A taxpayer is entitled to deduct uncompensated losses resulting from theft. Sec. 165(a), (c), (e).  To qualify for a theft loss deduction, a taxpayer must prove: (1) the occurrence of a theft, (2) the amount of the theft loss, and (3) the year in which the taxpayer discovers the theft loss.  <u>See</u> sec. 165(a), (b), (c), (e).  "As used in section 165, the term 'theft' is a word of general and broad connotation, intended to cover any criminal appropriation of another's property, including theft by larceny, embezzlement, obtaining money by false pretenses, and any other form of guile."  <u>Littlejohn v. Commissioner</u>, T.C. Memo. 2020-42, at \*26; <u>see also</u> <u>Bellis v. Commissioner</u>, 61 T.C. 354, 357 (1973), <u>aff'd</u>, 540 F.2d 448 (9th Cir.

[*7] 1976); sec. 1.165-8(d), Income Tax Regs. "[A]ny loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss." Sec. 165(e); see also sec. 1.165-1(d)(3), Income Tax Regs.

B.    Rev. Proc. 2009-20

In April 2009 the IRS published two pieces of administrative guidance-- Rev. Rul. 2009-9, 2009-14 I.R.B. 735, and Rev. Proc. 2009-20, supra--as to the proper treatment of losses from certain investment arrangements later discovered to be fraudulent. The former addresses the tax treatment of losses from Ponzi schemes in the light of section 165 and its accompanying regulations. The latter provides "an optional safe harbor under which qualified investors * * * may treat a loss as a theft loss deduction when certain conditions are met." Rev. Proc. 2009- 20, sec. 2.04, 2009-14 I.R.B. at 749.

The safe harbor is made available to a "qualified investor" who experiences a "qualified loss". Id. sec. 5.01, 2009-14 I.R.B. at 750-751. A qualified loss is defined to include a loss "from a specified fraudulent arrangement in which, as a result of the conduct that caused the loss" the lead figure was charged by indictment or information with the commission of "fraud, embezzlement or a similar crime that, if proven, would meet the definition of theft for purposes of

**[*8]** § 165".[4]  Id. sec. 4.02(1), 2009-14 I.R.B. at 750.  A qualified investor is

defined as one qualified to deduct theft losses under section 165 who "did not

have actual knowledge of the fraudulent nature of the investment arrangement

prior to it becoming known to the general public".  Id. sec. 4.03(2).

As relevant to this case the safe harbor permits the deduction of 95% of a

qualified investor's "qualified investment".[5]  Id. sec. 5.02(1)(a), 2009-14 I.R.B.

at 751.  Rev. Proc. 2009-20, sec. 6.01(1), 2009-14 I.R.B. at 751, specifies that the

safe harbor "must" be claimed on the "federal income tax return for the discovery

year."  The "discovery year" is defined as "the taxable year of the investor in

which the indictment, information, or complaint described in section 4.02 of this

revenue procedure is filed."[6]  Id. sec. 4.04.

---

[4]Rev. Proc. 2009-20, sec. 4.01, 2009-14 I.R.B. 749, 750, in turn defines a specified fraudulent arrangement as one in which the lead figure "receives cash or property from investors; purports to earn income for the investors; reports income amounts to the investors that are partially or wholly fictitious; makes payments, if any, of purported income or principal to some investors from amounts that other investors invested in the fraudulent arrangement; and appropriates some or all of the investors' cash or property."

[5]Rev. Proc. 2009-20, sec. 4.06, defines qualified investment to specify the amount associated with the arrangement that can be considered for purposes of calculating the deduction amount.

[6]In 2011 the IRS modified the definition of discovery year to mean the later of either the year in which the civil complaint or similar document which alleges

(continued...)

**[*9]** III.     <u>Analysis</u>

In respondent's motion for partial summary judgment and petitioners' response the parties dispute whether the Giambrones satisfied the requirements of Rev. Proc. 2009-20, <u>supra</u>.

As a preliminary matter, we note that revenue procedures are not binding on this Court. <u>See, e.g.</u>, <u>Raifman v. Commissioner</u>, T.C. Memo. 2018-101, at *48; <u>6611, Ltd. v. Commissioner</u>, T.C. Memo. 2013-49, at *50 n.24. Nor do they, as a general matter, confer substantive rights on taxpayers. <u>See</u> <u>Capitol Fed. Sav. & Loan Ass'n v. Commissioner</u>, 96 T.C. 204, 216-217 (1991); <u>see also</u> <u>Estate of Shapiro v. Commissioner</u>, 111 F.3d 1010, 1018 (2d Cir. 1997), <u>aff'g</u> T.C. Memo. 1993-483. Courts "have refused to invalidate the Commissioner's determinations arising out of his failure to abide" by revenue procedures. <u>Capitol Fed. Sav. & Loan Ass'n v. Commissioner</u>, 96 T.C. at 217. Thus, even if the Giambrones were to establish that the IRS had erred in its application of Rev. Proc. 2009-20, <u>supra</u>, we would not be required to conclude that they are entitled to the claimed theft loss deductions.

---

[6](...continued) facts that comprise substantially all the elements of a specified fraudulent arrangement is filed, or the year in which the lead figure dies. <u>See</u> Rev. Proc. 2011-58, sec. 4.04, 2011-50 I.R.B. 849, 850.

**[\*10]** In any event the Giambrones plainly did not qualify for the safe harbor. "As with any question of textual interpretation, the starting point for our analysis must be the text itself." Hawse v. Commissioner, T.C. Memo. 2015-99, at \*17. According to Rev. Proc. 2009-20, secs. 4.04, 6.01(1), a taxpayer must elect safe harbor treatment on his tax return "for the discovery year", which is defined as the year in which an indictment, information, or criminal complaint is filed against the lead figure.

As relevant to this case, Mr. Farkas was indicted in June 2010, making 2010 the discovery year. To avail themselves of Rev. Proc. 2009-20, supra, the Giambrones were required to claim safe harbor treatment on their respective 2010 Federal tax returns. They did not do so and accordingly were not eligible for the safe harbor.

The Giambrones do not dispute that they failed to request safe harbor treatment on their 2010 Federal tax returns. They assert, however, that the definition of discovery year set forth in Rev. Proc. 2009-20, supra, is incompatible with section 165(e) and section 1.165-1(d)(3), Income Tax Regs., and that they qualify for the safe harbor under the broader terms of the Code and the accompanying regulation.

**[*11]** The Giambrones are laboring under a fundamental misconception: Rev. Proc. 2009-20, supra, is not required to comport with the terms of section 165 (or the accompanying regulation). It is an exercise of administrative discretion on the part of the IRS, offering beneficial treatment for categories of theft losses meeting certain well-defined conditions.[7] The Giambrones cannot gain the benefit of it without adhering to its conditions the IRS imposed. See, e.g., Beech Trucking Co. v. Commissioner, 118 T.C. 428, 444 (2002).[8]

IV.    Conclusion

We accordingly will grant summary judgment in favor of respondent on the issue whether the Giambrones are entitled to claim theft loss deductions under Rev. Proc. 2009-20, supra. We leave all other questions, including whether the Giambrones qualify for the section 165 theft loss deductions, to be decided by further proceedings in these cases.

---

[7]"We have recognized * * * that an abuse of discretion can occur where the Commissioner fails to observe self-imposed limits upon the exercise of his discretion, provided he has invited reliance upon such limitations." Capitol Fed. Sav. & Loan Ass'n v. Commissioner, 96 T.C. 204, 217 (1991). Here, the IRS stayed within the bounds set forth in Rev. Proc. 2009-20, supra, when disallowing the Giambrones' belated safe harbor requests.

[8]Given our holding on this point, we need not reach the parties' alternative arguments regarding whether the other conditions of Rev. Proc. 2009-20, supra, are met.

**[\*12]**  To reflect the foregoing,

An appropriate order will be issued.